751 S.E.2d 645

The STATE, Respondent,

v.

William Mark BROCKMEYER, Appellant.

Appellate Case No. 2011–198266.

No. 27333.

Supreme Court of South Carolina.

Heard May 15, 2013.
Decided Nov. 27, 2013.

A. Mattison Bogan and Miles E. Coleman of Nelson Mullins Riley & Scarborough, LLP, and Chief Appellate Defender Robert M. Dudek, all of Columbia, for Appellant.

Attorney General Alan M. Wilson, Chief Deputy Attorney General John W. McIntosh, and Senior Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia, and Solicitor Donald V. Myers of Lexington, for Respondent.

Justice KITTREDGE.

Appellant William Mark Brockmeyer appeals his convictions for murder and possession of a weapon during a violent crime, raising constitutional challenges to both the trial court's refusal to enforce a subpoena concerning the identity of an internet commenter and the admission of certain chain-of-custody testimony and other photographic evidence at trial. We affirm.

## I.

Appellant William Mark Brockmeyer and Nicholas Rae (the victim) knew each other for seven or eight years before the shooting; the two met while working together at a tree service company, and thereafter, they both served time in the same prison facility.[1] On the night of the shooting, Brockmeyer, the victim, and several mutual friends attended a house party and then visited a bar known as Jager's Private Club in Lexington County, South Carolina. Because Jager's was a private bar, only members and their guests were permitted to enter, and every person who entered the bar was required to sign in. Among the group of friends was Gina Brakefield, who saw both Brockmeyer and the victim carrying guns—the victim had a large pellet gun and Brockmeyer carried a .380 caliber pistol.[2] According to several witnesses, Brockmeyer's demeanor at Jager's was agitated and aloof.

---

[1]. About three weeks before the shooting, the victim moved to Lexington County from Florida to live with Brockmeyer. At the time of the shooting, Brockmeyer and the victim were living together in a hotel.

[2]. Brakefield also testified that, after the group arrived at Jager's and began dancing, she felt a small gun tucked in the waistband of Brockmeyer's pants and that Brockmeyer commented, "it is hard to dance with a pistol in your pants." Additionally, at least three other witnesses

Upon arriving at Jager's, the group bought drinks, sat down at a table near the dance floor and began talking, dancing, and hanging out. Thereafter, the victim separated from the group and headed across the bar to challenge another patron, Amera Kabar, to a game of billiards. Although the victim claimed to be more skilled than Kabar, the victim lost four consecutive games of pool[3] and a total of three hundred dollars in wagers to Kabar.[4] According to Kabar, the victim left the pool table area to have a discussion with Brockmeyer before agreeing to the stakes for each game. During the fourth game, Brockmeyer approached the pool table and lifted his shirt to reveal the gun tucked into his waistband, threatening Kabar, "This is how we do it." However, instead of becoming frightened, Kabar dropped all pretense of unskillfulness and "ran the table," sinking all the remaining balls without giving the victim another turn. Kabar testified that by the last game of pool, the victim was intoxicated, and although he appeared disappointed, he remained polite, thanking her and congratulating her on a "great game."

After finishing the pool games, the victim, clearly intoxicated,[5] rejoined his friends at their table. The victim was helped outside by a female friend. Several people smoking outside the bar entrance saw the victim vomit and then sit down in a chair on the front porch. Brockmeyer followed the victim through the bar and watched him through the front doors of the bar. Still inside the bar, Brockmeyer pulled the gun from his waistband, despite the attempts of another female friend to stop him.

Brockmeyer walked outside and knelt in front of the victim, who was slumped over in a chair, asleep with his hands by his side. Brakefield saw Brockmeyer whisper in the victim's ear,

---

testified they saw the victim with a large pellet gun and Brockmeyer with a smaller pistol.

3. Kabar admitted she "kept [the games] close to keep him wanting to play me."

4. Brockmeyer denied giving the victim three hundred dollars, claiming he gave the victim just forty dollars.

5. The autopsy revealed the victim's blood alcohol concentration was 0.227 at the time of death.

raise his hand toward the victim's neck, and fire a shot. Brakefield screamed, ran inside the bar, and shouted for someone to call 9–1–1. Brockmeyer immediately exited the front porch and headed towards the wooded area behind the bar. The other people on the porch heard the shot and saw Brockmeyer walking towards the woods immediately afterwards. Upon realizing the victim had been shot, the witnesses left the porch, running through the bar and out the back exit before the police arrived.

Commotion ensued, both inside and outside the bar. Several patrons surrounded the victim and attempted to administer first aid. Brockmeyer reappeared several minutes later, having removed his white Sean John brand t-shirt and wearing only a tank-top undershirt. Police officers arrived shortly and began collecting evidence and interviewing witnesses. That night, Brockmeyer offered several conflicting explanations about what had happened, including that he was inside when the victim was shot, that the victim committed suicide, and that "black guys" shot the victim. Brockmeyer was taken to the police station for questioning where he eventually admitted shooting the victim but claimed the gun went off accidentally. Brockmeyer was arrested and charged with murder and one count of possession of a weapon during the commission of a violent crime.

At trial, Brockmeyer contended the shooting was an accident—he saw the victim slumped over with the .380 pistol in his lap, and when Brockmeyer claimed he reached for the gun, a shot went off. Brockmeyer admitted possessing the gun earlier in the evening and disposing of it in the woods behind the bar after the shooting. However, Brockmeyer claimed he only temporarily held onto the .380 pistol while the victim played pool (at the victim's request) and that he was unarmed at the time he followed the victim outside. Brockmeyer contended he did not realize the victim was hurt until after he disposed of the gun, and upon hearing the victim was injured, he became very emotional because the two were close friends. One witness, Mariko Clack, testified Brockmeyer was weeping and was "really shaky and frantic" after he was told the victim had been shot.

The autopsy revealed the victim died as a result of a .380 caliber gunshot wound to the neck. The pathologist testified the gunshot wound was a "hard contact" wound, meaning the weapon was pushed firmly against the skin at the time the shot was fired—so firmly as to leave a visible a muzzle imprint.

A jury convicted Brockmeyer of murder and the weapon charge, and Brockmeyer was sentenced to an aggregate term of forty years in prison. Brockmeyer appealed, and this matter was transferred to this Court from the court of appeals pursuant to Rule 204(b), SCACR.

## II.

Brockmeyer argues the trial court committed reversible error in failing to grant his motion to enforce a subpoena directed at a news media outlet. We disagree.

"[C]riminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). However, "the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses.'" *United States v. Valenzuela–Bernal* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Rather, to demonstrate a Compulsory Process Clause violation, an appellant must make some plausible showing of how the testimony of an absent witness would have been both material and favorable to his defense. *Id.*

Less than twenty-four hours after the shooting, a news article about the shooting was published on a website operated by WLTX, a local television station. The WLTX website allows users to establish an account which they may use to post comments and exchange messages on the WLTX website. The online registration process requires a person to submit his or her gender, year of birth, and zip code, and, for users who wish to access discussion forums and sharing pages, the user's name and email address are also required. The WLTX Privacy Notice, which all users had to accept, included a

notification that WLTX could release user information "if required to do so by law or if, in [WLTX's] business judgment, such disclosure is reasonably necessary to comply with legal process."

The day after the shooting, someone using the pseudonym "AndTheTruth" posted the following comment on the WLTX website in response to the online article about the shooting:

> Were you there, did you see what happened, did you see the tears on his young confused face when he realized he had just accidentally killed his friend . . .
>
> -God makes provision for an accidental or carelessly caused death. Judge not, and ye shall not be judged:
>
> . . . .
>
> -My Heart & Prayers go out to both families & all of my friends who had to see this happen, may God be with you all . . .

The theory of Brockmeyer's defense was that the shooting was an accident. Brockmeyer wanted evidence supporting his claim of accident and being emotionally upset after the shooting. Brockmeyer contends the anonymous comment suggests its author had direct knowledge of the incident and supports Brockmeyer's claim of an accidental shooting. Accordingly, Brockmeyer wished to explore the possibility that the commenter might be a potential defense witness and served WLTX with a subpoena seeking the following information:

> Any and all registration information for the username "AndTheTruth" that replied on July 12, 2010 @ 1:36 AM EDT to the news article regarding William Mark Brockmeyer being charged with the shooting death of [the victim].

WLTX objected to the subpoena, arguing the commenter's identity was protected anonymous speech under the First and Fourteenth Amendments.[6] Brockmeyer acknowledged the po-

---

6. "Congress shall make no law . . . abridging the freedom of speech, or of the press[.]" U.S. Const. amend. I. "'[A]n author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment.'" *Enterline v. Pocono Med. Ctr.*, 751 F.Supp.2d 782, 787 (M.D.Pa.2008) (quoting *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 342, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995)). "This is because 'the interest in having anonymous works

336

sition of WLTX in the abstract, but insisted that his constitutional right to a fair trial required disclosure of the identity of the anonymous commenter.[7]

Based on WLTX's objection, Brockmeyer thereafter filed a motion to enforce the subpoena, contending he was entitled to explore potential witnesses and present a defense by virtue of the Sixth and Fourteenth Amendments. At the pre-trial motion hearing, defense counsel explained:

> Basically the defense, in exploring [Brockmeyer's] defense in this case, wanted to have the information about this witness so we could potentially talk to them [sic] to see if they [sic] could be a mitigating witness or a defense witness in this matter.

Brockmeyer argued his right to present an accident defense was "way more important" than any right asserted by WLTX, including the anonymous commenter's First Amendment rights. Brockmeyer contended he had no other means to procure the information sought.[8] WLTX countered that to the extent the anonymous commenter actually witnessed the shooting, his or her identity was ascertainable from other sources, given the exhaustive witness list the State provided to Brockmeyer.

---

enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry.' " *Id.* Indeed, "[i]t is clear that speech over the internet is entitled to First Amendment protection" and that "[t]his protection extends to anonymous internet speech." *Doe v. Cahill,* 884 A.2d 451, 456 (Del.2005). While the position of WLTX has merit, the present situation was not easily resolved, for Brockmeyer's right to a fair trial was implicated, thus creating a tension between constitutional protections.

7. Although neither of the parties addresses the issue of whether WLTX had standing to assert a First Amendment challenge on behalf of the anonymous commenter, other courts have found a news station has standing in similar circumstances. *See, e.g., Enterline,* 751 F.Supp.2d at 784–86 (finding, as a matter of first impression, that a newspaper had third-party standing to assert free speech rights of individuals posting to (a or the) newspaper's online forums).

8. Brockmeyer also argued the anonymous commenter's acceptance of the terms of the WLTX Privacy Notice constituted a waiver of all privacy rights. Because the trial court did not rule on this argument, it is not preserved for appellate review and we do not reach it.

In this regard, Jager's, a private bar, required each customer sign in upon entering the bar. Law enforcement obtained the sign-in list of everyone who entered the bar on the night of the shooting. At the motion hearing, defense counsel admitted the State had provided the defense with a copy of the sign-in list from the night of the shooting.

The trial judge noted the competing interests at issue—specifically, Brockmeyer's constitutionally guaranteed rights and an anonymous speaker's First Amendment right not to reveal his or her identity. However, because disclosure of the anonymous commenter's identity could potentially produce testimony only if the commenter was present at the scene, and because the defense had previously been given a list of all persons who signed in as a client at the bar on the night of the shooting, the trial court concluded that, if the information exists, it was readily available through other means. As a result, the trial judge declined to enforce the subpoena at that time.[9] However, the trial court directed the State to further assist the defense following the hearing to ascertain the identity of certain witnesses whose signatures were illegible on the bar sign-in list. The State agreed, promising to do so by the end of that day. The issue was not mentioned again.

At trial, Brockmeyer did not renew his motion to enforce the subpoena or argue to the trial judge that he still required this information. On appeal, Brockmeyer asks the Court to reverse his conviction, arguing he is constitutionally guaranteed the right to compel witnesses in his favor and that he was denied that right by the trial court's refusal to enforce his subpoena directing WLTX to disclose the anonymous commenter's registration information.

This Court has not specifically addressed whether and under what circumstances the right to anonymity must give way to other constitutionally protected interests, such as a criminal defendant's rights under the Sixth Amendment's

---

9. We also note the trial court correctly held the commenter's privacy is not privileged under the news media shield law, finding the shield law was not applicable because the information was not source information but rather voluntary expression by an anonymous person. *See* S.C.Code § 19-11-100(A) (providing that a news reporter "has a qualified privilege against disclosure of any information, document, or item obtained or prepared in the gathering or dissemination of news.").

Compulsory Process Clause. Both parties urge the Court to adopt a four-part standard for evaluating a subpoena that seeks the identity of an anonymous Internet user who is not a party to the underlying litigation:

(1) the subpoena seeking the information was issued in good faith and not for any improper purpose,

(2) the information sought relates to a core claim or defense,

(3) the identifying information is directly and materially relevant to that claim or defense, and

(4) the information sufficient to establish or to disprove that claim or defense is unavailable from any other source.

*Doe v. 2TheMart.com Inc.,* 140 F.Supp.2d 1088, 1095 (W.D.Wash.2001).[10]

[5] Although Brockmeyer presents a compelling argument for the disclosure of the commenter under the circumstances presented, we decline to reach this issue on issue preservation grounds. We have no way of properly evaluating Brockmeyer's continuing need for the information he sought to subpoena following the trial judge's instructions for the solicitor to take additional steps to assist the defense in identifying everyone at Jager's on the night of the shooting. This is so because Brockmeyer failed to renew his motion at the outset of trial. Thus, Brockmeyer has failed to provide this Court with a sufficient record on appeal to evaluate this assertion of error. *See Harkins v. Greenville Cnty.,* 340 S.C. 606, 616, 533 S.E.2d 886, 891 (2000) (finding it impossible to evaluate the merits of certain issues because the Appellant failed to include the relevant material in the record on appeal); *Crestwood Golf Club, Inc. v. Potter,* 328 S.C. 201, 215, 493 S.E.2d 826, 834

---

10. Courts have adopted varying iterations of this test, but, for the most part, they are similar—they involve striking a balance between competing interests and require the party seeking evidence to make a showing of good faith, materiality, relevancy and unavailability from another source. *See, e.g., 2TheMart.com Inc.,* 140 F.Supp.2d at 1095 (noting the adopted test "provides a flexible framework for balancing the First Amendment rights of anonymous speakers with the right of civil litigants to protect their interests through the litigation discovery process"); *Cahill,* 884 A.2d at 460 (setting forth "the appropriate test by which to strike the balance" between the right to exercise free speech anonymously and the right to obtain the identity of the anonymous speaker).

(1997) (noting an appellant bears the burden of providing a sufficient record to review his assertions of error).

■ However, even assuming the trial court erred in not requiring disclosure of the anonymous commenter's identity, the error would not be reversible. Brockmeyer is unable to show he was prejudiced by the trial judge's denial of his motion to enforce the subpoena. More to the point, evidence of an accidental shooting and Brockmeyer's distraught state was presented. Brockmeyer testified that the shooting was an accident and that he was "in shock" afterwards. More importantly, Mariko Clack, who was among the group of friends with Brockmeyer and the victim on the night of the shooting, testified that Brockmeyer was weeping and was "really shaky and frantic" after the shooting. Thus, any error was harmless because even assuming the anonymous commenter testified to that effect, it would have been cumulative.[11] *See State v. Commander*, 396 S.C. 254, 263, 721 S.E.2d 413, 418 (2011) ("To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, i.e., that there is a reasonable probability the jury's verdict was influenced by the challenged evidence or the lack thereof."). In sum, the issue is not properly preserved, but in any event, any error in the trial court's refusal to enforce the subpoena would not constitute reversible error.

### III.

Brockmeyer argues statements of certain non-testifying evidence custodians found in computerized chain-of-custody logs were introduced indirectly at trial in violation of the Confron-

---

11. Assuming the anonymous commenter was present and actually witnessed the shooting, he or she would not have been able to testify that the killing "was an accident." Any testimony would have been limited to what the witness observed, with the ultimate decision of murder or accidental killing to be decided by the jury. *See* Rule 602, SCRE ("A witness may not testify to a matter unless ... the witness has personal knowledge of the matter."); *State v. Commander*, 396 S.C. 254, 269, 721 S.E.2d 413, 421 (2011) (finding testimony in the form of a legal conclusion is generally improper); *State v. Wise*, 359 S.C. 14, 27, 596 S.E.2d 475, 481 (2004) (a defendant is prohibited from directly eliciting the opinion of lay witnesses about the ultimate issue to be decided by the jury).

tation Clause of the Sixth Amendment. Brockmeyer argues this constitutional violation invalidated the chain of custody and rendered the related evidence inadmissible. We disagree.

■■ " 'The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion.' " *State v. Hatcher*, 392 S.C. 86, 91, 708 S.E.2d 750, 753 (2011) (quoting *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006)). " 'An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law.' " *Id.*

■ The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This procedural protection applies in both federal and state prosecutions by virtue of the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

In *Crawford v. Washington*, the Supreme Court unanimously found the criminal defendant's Confrontation Clause rights had been violated by the admission into evidence a tape recording of a nontestifying person's "testimonial" statement to police. 541 U.S. 36, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *Crawford* changed the law to prohibit the admission of testimonial, out-of-court statements unless two conditions are met: the witness is unavailable at trial and the defendant had a prior opportunity to cross-examine the witness. *Id.* at 68. Although *Crawford* applies whenever "testimonial evidence is at issue," the Supreme Court emphasized that "nontestimonial" evidence is exempted from Confrontation Clause scrutiny altogether. *Id.*

Thereafter, in *Melendez–Diaz v. Massachusetts*, the Supreme Court found sworn certificates from forensic analysts, which were admitted at trial to attest that the substance seized from the criminal defendant was cocaine, were testimonial in nature and thus subject to the Confrontation Clause. 557 U.S. 305, 311, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). The Supreme Court noted "the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance," and held that the analysts were "witnesses" for the purposes of the Confron-

tation Clause and that the testimonial statements were "against" the criminally accused because they proved a fact necessary for his conviction—namely, that the substance he possessed was cocaine. *Id.* at 311–12, 129 S.Ct. 2527. However, the Supreme Court also noted "[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, . . . must appear in person as part of the prosecution's case." *Id.* at 311 n. 1, 129 S.Ct. 2527. Although " 'it is the obligation of the prosecution to establish the chain of custody,' this does not mean that everyone who laid hands on the evidence must be called." *Id.* Indeed, " 'gaps in the chain of custody normally go to the weight of the evidence rather than its admissibility.' " *Id.* (quoting *United States v. Lott,* 854 F.2d 244, 250 (7th Cir. 1988)).

Two years later, the Supreme Court decided *Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). Bullcoming was convicted of driving under the influence. The trial court admitted in evidence a lab report indicating his blood alcohol concentration (BAC) was at "an inordinately high level." *Id.* at 2710. The lab analyst who prepared the report was not available to testify, and counsel objected to the introduction of the lab report because it violated Bullcoming's right to confront his accuser. The Supreme Court agreed, rejecting New Mexico's reliance on the business record exception to rules against hearsay, and reversed the conviction. *Id.* at 2710–13.

Concurring separately in *Bullcoming,* Justice Sotomayor emphasized that the BAC report at issue was testimonial in nature because its " 'primary purpose' is evidentiary," and therefore the Sixth Amendment's Confrontation Clause was triggered. *Id.* at 2719. Further, Justice Sotomayor noted that "in the Confrontation Clause context, business and public records 'are generally admissible *absent confrontation* because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—*they are not testimonial.*' " *Id.* at 2720 (quoting *Melendez–Diaz,* 557 U.S. at 325, 129 S.Ct. 2527) (emphasis added).

In short, the Confrontation Clause analysis turns on whether the challenged out-of-court statement is testimonial. Indeed, the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354 (citing 2 N. Webster, An American Dictionary of the English Language (1828)); *see Michigan v. Bryant*, —— U.S. ——, ——, 131 S.Ct. 1143, 1153, 179 L.Ed.2d 93 (2011) ("We therefore limited the Confrontation Clause's reach to testimonial statements ....."). Only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (citing *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354). "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Id.*

Under the primary purpose analysis required by the Confrontation Clause, where the primary purpose of an out-of-court statement is to serve as evidence or "an out-of-court substitute for trial testimony," the statement is considered testimonial. *Bullcoming*, 131 S.Ct. at 2721–23 (Sotomayor, J., concurring). However, "[w]here no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Michigan v. Bryant*, 131 S.Ct. at 1155; *see, e.g., Melendez–Diaz*, 557 U.S. at 324, 129 S.Ct. 2527 ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—*they are not testimonial.*" (emphasis added)); *Davis*, 547 U.S. at 822, 126 S.Ct. 2266 ("Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.").

In determining the primary purpose of the out-of-court statement, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular

encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Bryant*, 131 S.Ct. at 1156. "In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Id.* at 1155. Thus, "[d]ocuments kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status." *Melendez–Diaz*, 557 U.S. at 321, 129 S.Ct. 2527 (citing Fed.R.Evid. 803(6)).

 Recently, the Fourth Circuit Court of Appeals examined the Supreme Court's Confrontation Clause jurisprudence—including *Crawford, Melendez–Diaz,* and *Bullcoming*—and concluded " 'the chain of custody is not relevant when a witness identifies the object as the actual object about which he testified.' " *United States v. Summers*, 666 F.3d 192, 201 (4th Cir.2011) (quoting *United States v. Phillips*, 640 F.2d 87, 94 (7th Cir.1981)). "Establishing a strict chain of custody 'is not an ironclad requirement, and the fact of a missing link does not prevent the admission of real evidence, so long as there is sufficient proof that the evidence is what it purports to be and has not been altered in any material respect.' " *Id.* (quoting *United States v. Ricco*, 52 F.3d 58, 61–62 (4th Cir. 1995)). "The [trial] court's role is merely to act as a gatekeeper for the jury, and the proponent of the evidence need only make a prima facie showing of its authenticity." *Id.* (citing *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir.2009)).[12]

On appeal, Brockmeyer challenges the admission of certain evidentiary items on the grounds that the State failed to call to the witness stand every evidence custodian to testify about the chain of custody. Specifically, Brockmeyer challenges the admission of (1) a t-shirt Brockmeyer was wearing on the night of the shooting (State's Exhibit # 25); (2) a spent shell casing recovered near the victim's body (State's Exhibit # 28);

---

**12.** Although phrased in slightly different terms, we find the Fourth Circuit's analysis in *Summers* is consistent with this Court's decision in *State v. Hatcher*, 392 S.C. 86, 708 S.E.2d 750 (2011) (finding the State need not establish the identity of every person handling evidence items in all circumstances, but rather the appropriate standard is whether, in the discretion of the trial judge, the State has established the chain of custody as far as practicable).

344

(3) a magazine from a .380 semiautomatic pistol recovered at the scene (State's Exhibit # 30); (4) a Ceska .380 semiautomatic pistol discovered near the back fence of the Jager's property (State's Exhibit # 48); and (5) a fired projectile and jacket recovered from the victim's body during the autopsy (State's Exhibit # 53).

At trial, the State called Investigator Day, who testified that during the course of his investigation he collected the following from the scene: Brockmeyer's t-shirt, the spent shell casing, the pistol magazine and the .380 caliber semiautomatic pistol. Following authentication by Investigator Day, photographs of each item were admitted without objection. Thereafter, the State moved for admission of the items into evidence. Defense counsel objected to the admission of the items, arguing the State failed to lay a "sufficient chain of custody or foundation." Notably, Brockmeyer's objection to the admission of these items was based solely on the allegedly insufficient foundation—not a Confrontation Clause violation.

The trial judge overruled the objections, finding a proper foundation was laid by Investigator Day's testimony identifying each item as the item he collected. Thereafter, outside the presence of the jury, the following colloquy took place between defense counsel and the trial judge:

> The Court: I have overruled the defense objections to the chain of custody based on the State providing sufficient evidence to demonstrate a reasonable assurance that the items were the same as when collected. I do that based on State versus Hatchell [13] [sic].... [I]n these various matters that you objected to, [the witness] testified that he himself collected it and testified that they were in the same condition when he put them in the sealed containers. So I have some concerns about what is the basis for your objection.
>
> [Defense Counsel]: Judge, he has absolutely no idea what has happened with any of these items. Our position would be that they are fungible items. In other words, there is not a big difference—
>
> The Court: My ruling is only as to this stage, you understand. We will deal with it as we go along as to what, if anything, occurred.

---

13. *State v. Hatcher,* 392 S.C. 86, 708 S.E.2d 750 (2011).

[Defense Counsel]: Yes, sir. Quite honestly, I think at this point if they are in, that maybe chain of custody arguments in the future are inapplicable. That's why I objected to them at this point in time. I think they would have had to gone [sic] through the chain of custody before they ultimately introduced those.

The Court: I respectfully disagree. I will not tell the solicitor how to try his case. Obviously, he has got to finish his chain of custody. The only thing I am telling you at this time it was appropriate that these items be introduced based on his testimony. He said he found them. He did it with the same thing. Now, I assume they will offer testimony as to what occurred in the interim. We will see.

Thereafter, the State offered the testimony of Investigator Troy Crump, who testified that he was present at the autopsy and collected a fired projectile recovered from the victim's body (State's Exhibit # 53). After a photograph of the projectile was admitted without objection, the State submitted the projectile itself for admission into evidence. As with the previous items, defense counsel objected to the admission of the projectile based on "insufficient foundation because of the chain of custody." Again, no Confrontation Clause objection was raised. The trial judge overruled the objection and the fired projectile was admitted.

Thereafter, to establish a foundation for later admitting forensic analyses of the items, the State further developed the chain of custody for each piece of evidence. Investigator Crump testified that the autopsy pathologist recovered the projectile, placed it in a bottle, heat-sealed the bottle inside a plastic bag, and initialed and dated the seal. Investigator Crump testified that, immediately upon the conclusion of the autopsy, he took custody of the sealed bag containing the projectile, transported it directly to the Lexington County Sheriff's Department (LCSD) facility, and stored it in a secure laboratory overnight.[14] Investigator Crump testified that, as

---

14. Regarding the security of the laboratory, the State presented the testimony of Lieutenant Scottie Frier, the supervisor of the LCSD crime scene laboratory, who testified that the laboratory is secure and can be accessed only by himself, Investigator Day, Investigator Crump and seven other crime scene investigation employees. Lieutenant Frier testified he did not touch the fired projectile while it was stored

soon as the evidence storage facility opened the following morning, he retrieved the projectile from the lab and gave it to an evidence custodian. Investigator Crump testified that, at the time he transferred custody to the evidence room, the plastic bag containing the projectile had not been opened, altered or manipulated.

Margaret Harmon, an LCSD evidence custodian, verified that she received the fired projectile from Investigator Crump along with various items from Investigator Day, including the t-shirt, the shell casing, the pistol and the magazine. Harmon testified that each item was sealed with tamperproof tape and that, at the time she received them, no one had opened, altered, or manipulated any of the containers.

The solicitor then asked Harmon to recite the chain of custody for each item. Referring to the LCSD chain-of-custody log, defense counsel objected to Harmon's testimony, arguing her testimony constituted inadmissible hearsay. Specifically, counsel asserted it was improper for Harmon to read from the custody logs because they were not subject to the business records exception of Rule 803(6), SCRE. Notably, as with Brockmeyer's objection to the admission of the items themselves, this objection failed to allege a Confrontation Clause violation.

The trial judge overruled Brockmeyer's hearsay objection, finding law enforcement agencies are entitled to avail themselves of the business records exception and that these chain-of-custody records were kept in the normal course of business. The trial judge concluded Harmon's testimony was admissible.

Regarding the pistol magazine, Harmon testified the item had remained in the continuous custody of the LCSD evidence facility from the time it was initially submitted by Investigator Day until it was brought to court for trial. Harmon testified that she or Candy Kyzer, another LCSD evidence custodian,

---

overnight in the laboratory and that it is the practice of the crime lab employees not to touch or handle any evidence unless specifically involved in the investigation. Additionally, the State went so far as to present the testimony of each of the other seven LCSD crime scene investigation employees—Renee Strickland, Glen Ross, Michael Phipps, Shelby Derrick, D.I. Blackwell, and Duane Johnson—each of whom testified that they did not touch, handle, manipulate, or alter the plastic bag or fired projectile in any way while it was stored in the lab.

released the t-shirt, the shell casing, the pistol, and the recovered projectile to Investigator Day, who transferred all four of those items to Amy Stephens of the South Carolina Law Enforcement Division (SLED) on July 14, 2010. Kyzer did not testify.

In further developing the chains of custody, the State offered the testimony of Amy Stephens, a forensic technician in the evidence control department at SLED. Referring to the SLED chain-of-custody report, Stephens testified that she accepted the t-shirt, the pistol, the shell casing, and the fired projectile from Investigator Day, and that she immediately transferred those items to the firearms evidence intake storage. Although the SLED chain-of-custody reports were not offered into evidence, defense counsel objected to Stephens' testimony reciting the information contained the reports on the basis that it was hearsay. Additionally, for the first time, defense counsel alleged a Confrontation Clause violation under the rule set forth in *Crawford.* The trial judge asked defense counsel to clarify the objection:

> The Court: I have ruled that [Stephens] is entitled to use these records. What other—what other objection? As an example, she has used about 15 names. Are you suggesting the State needs to call in every one of those witnesses? [Defense Counsel]: No, sir. Judge, I would think that the chain of custody would be complete for our purposes as to the last person who tests it. .... I don't have a problem if they stop with whatever forensic scientist in the end that they plan on calling to testify.

The trial judge overruled the objection, stating Stephens "is entitled to use the records, but that takes care of it," implicitly finding the testimony did not implicate the Confrontation Clause. Thereafter, the relevant chains of custody were developed as follows.

*T–Shirt*

Stephens testified the t-shirt was retrieved from storage by Lisa Waananen [15] on July 15, 2010, and submitted to trace evidence examiner Ila Simmons to be tested for the presence of gunshot residue (GSR). Simmons testified she recognized

---

15. Lisa Waananen did not testify.

the t-shirt because it was marked with her laboratory identification number, the item number, her initials, and the date she performed the analysis. Simmons further testified the t-shirt was in a sealed container when she received it and that she performed particle lifts from the t-shirt and examined those for the presence of GSR.[16] Stephens testified that Simmons returned the t-shirt to the SLED storage room on August 11, 2010, where it remained until it was released to forensic technician Betty Butler on October 20, 2010, for further testing.

Butler testified the t-shirt was in a properly sealed container when she received it and that it had not been tampered with. Butler testified she took DNA swabs from the t-shirt to test for possible blood or skin cells, then she re-sealed and initialed the box, and returned it to the evidence control department.[17]

Stephens confirmed that Butler returned the t-shirt to the evidence control department in a properly re-sealed container on October 25, 2010, following completion of the DNA testing, and the t-shirt was returned to Candy Kyzer of LCSD on December 1, 2010.

*Pistol, Shell Casing, and Fired Projectile:*

Again referring to the SLED chain-of-custody report, Stephens testified the .380 caliber pistol, the shell casing, and the fired projectile were retrieved from the evidence control department[18] for testing on July 23, 2010. Although all three items—the pistol, the shell casing, and the fired projectile—were eventually transferred to forensic scientist Michelle Eichenmiller for ballistics testing, the pistol was first transferred

16. Simmons' particle lift analysis (State's Exhibit # 69) was admitted without objection, and the results of those tests are not the subject of this appeal.

17. At trial, the DNA swabs Butler obtained were admitted over defense counsel's objection on the basis of *Crawford;* however, Brockmeyer does not challenge the admission of this DNA evidence on appeal.

18. Stephens' testimony indicated that she did not personally transfer the items to Eichenmiller; rather, SLED evidence technicians Nikki Perry Hughes and Doris Yarborough retrieved the items from storage and transferred them to Eichenmiller and Butler. Neither Hughes nor Yarborough testified.

to Butler for DNA testing. Butler testified the package containing the pistol was properly sealed and secured when she received it and that she swabbed the pistol for traces of DNA, re-sealed and initialed the container, then transferred the pistol to Michelle Eichenmiller for ballistics testing.

Michelle Eichenmiller, a firearms analyst for SLED, testified that she received the pistol, the shell casing, and the fired projectile, and at the time of her receipt, each item was in a sealed, taped package and had not been tampered with or altered. Eichenmiller testified that through laboratory testing, she was able to determine that the projectile recovered during the autopsy and the shell casing found near the victim's body were both fired by the pistol—State's Exhibit # 48. Following Eichenmiller's examination, Stephens testified, the items were returned to the SLED evidence control department and were subsequently returned to Candy Kyzer at the LCSD.

Defense counsel objected to the testimony of both Stephens and Eichenmiller on the basis of hearsay and, for the first time, defense counsel alleged a Confrontation Clause violation under *Crawford*[19]:

[Defense Counsel]: Judge, I would simply renew my previous objections under the chain of custody.

The Court: With reference to this issue[ ], let me hear your specific objection.

[Defense Counsel]: Under the chain of custody, under the proper foundation, and then also under Crawford versus Washington.

The Court: Where is it that you allege is a deficiency in the chain of custody? . . . . I want to hear with specificity what is your objection to this particular testimony?

[Defense Counsel]: Just the laying of the foundation and the chain of custody on the items that she is testifying to.

---

**19.** Although defense counsel specifically referenced *Crawford* in objecting to Stephens' testimony, counsel never identified the particular out-of-court statement alleged to violate the Confrontation Clause. Moreover, in overruling the objection, the trial judge ruled only that Stephens' testimony did not constitute hearsay; he did not rule on the constitutional issue and counsel did not bring that omission to the trial judge's attention.

The Court: You keep referring to the chain of custody. Where is it in your opinion [deficient]?

[Defense Counsel]: Judge, the same things I testified [sic] to as to hearsay and the business records exception that Your Honor had ruled upon previously. I believe I am required to renew it at this point in time.

The Court: On the business [record exception] only. Okay. My ruling on that speaks for the record.

Brockmeyer now argues that various law enforcement personnel listed within the chain-of-custody logs did not testify at trial in violation of the Confrontation Clause, thus rendering the admission of the t-shirt, the shell casing, the magazine, the .380 pistol, and the fired projectile reversible error. We reject this argument for several reasons.

▮▮▮▮ We first find Brockmeyer's claim is not preserved for appellate review. Although Brockmeyer objected to the admission of the t-shirt, the shell casing, the magazine, the .380 pistol, and the fired projectile, none of Brockmeyer's initial objections alleged a Confrontation Clause violation; rather, Brockmeyer challenged only the sufficiency of the foundation for admitting each item. The issue of whether evidence is admissible under "state-law requirements regarding proof of foundational facts" is distinct from the issue of whether a defendant's Sixth Amendment confrontation right was violated. *See Williams v. Illinois*, —— U.S. ——, ——, 132 S.Ct. 2221, 2243, 183 L.Ed.2d 89 (2012) ("[I]f a statement is not made for 'the primary purpose of creating an out-of-court substitute for trial testimony,' its admissibility 'is the concern of state and federal rules of evidence, not the Confrontation Clause.'" (quoting *Bryant*, 131 S.Ct. at 1155)). Thus, on appeal, Brockmeyer may not bootstrap a Confrontation Clause objection onto his objection to the State's proof of foundational facts. Although Brockmeyer eventually raised Confrontation Clause objections, those objections were untimely as to the admission of the items themselves and do not preserve for appellate review the issue of whether that evidence was properly admitted. *See State v. Aldret*, 333 S.C. 307, 312, 509 S.E.2d 811, 813 (1999) (finding where a defendant failed to call an alleged error to the trial judge's attention at the first opportunity to do so, the defendant is procedurally barred from raising the issue on appeal).

■ In any event, the challenged testimony referring to certain statements of other non-testifying evidence custodians in the chain-of-custody logs was admissible as a matter of state law and would not raise Confrontation Clause concerns. Therefore, the admission of the challenged non-fungible items was proper, notwithstanding Brockmeyer's inability to confront each custodian who handled the evidence.

■ "Hearsay is a statement, which may be written, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted." *In re Care & Treatment of Harvey*, 355 S.C. 53, 61, 584 S.E.2d 893, 897 (2003) (citing Rule 801, SCRE). "Hearsay is not admissible unless there is an applicable exception." *Id.* at 61–62, 584 S.E.2d at 897 (citing Rule 802, SCRE). The business record exception reads, in pertinent part:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness. . . .

Rule 803, SCRE.

At trial, Harmon testified that she was responsible for storing, tracking the physical custody, and maintaining control of all of the evidence collected by investigators and crime scene personnel. She testified that the record of who possessed each piece of evidence is referred to as a chain of custody and that the chain of custody paperwork accompanies the evidence as it is transferred. Harmon testified that, when evidence is first submitted to the LCSD facility, an evidence custodian verifies the identity of each item and ensures it is accompanied by a chain of custody form. The evidence custodian then enters the tracking information into a computer system and stores the evidence until it is released for testing or sent to court. Harmon testified that the chain of custody form is "basically . . . keeping track of who touches it and what happens to the evidence," and that the custody forms and data are maintained in the normal course of business.

Stephens testified at trial that she is a forensic technician in the SLED evidence control department and that she is responsible for logging in, packaging, and transferring evidence for forensic analysis in criminal cases. Stephens testified that it is SLED's practice to maintain electronic chain-of-custody records which document every location and person that handles or touches evidence.

We find the facts of this case demonstrate that the evidence logs were kept as business records for the purpose of identifying and storing evidentiary items. We find the trial judge properly determined the chain-of-custody reports fall within the hearsay exception in Rule 803(6), SCRE, and that the evidence custodians' testimony about the chains of custody was admissible. Critical to admissibility of the chain-of-custody records here is their non-testimonial nature. Regarding the Confrontation Clause analysis, these chains of custody were not created "for the *sole purpose* of providing evidence against the defendant." *Melendez–Diaz*, 557 U.S. at 323, 129 S.Ct. 2527. Indeed, the evidence logs do not purport to prove any fact necessary to the conviction, and the custodians who did not testify were in no manner involved in the testing or analysis of the recovered items; thus, the statements by non-testifying custodians contained in the chain-of-custody logs are not testimonial in nature because their "primary purpose" is not to constitute evidence in a criminal trial. Because we find these statements are not testimonial, they are exempt from Confrontation Clause scrutiny. *See Bullcoming*, 131 S.Ct. at 2720 (Sotomayor, J., concurring) ("[B]usiness and public records 'are generally admissible absent confrontation.'").

 Having determined there was no Confrontation Clause violation, the issue of the admissibility of testimony regarding the chains of custody is purely a question of state law. In this case, the challenged evidence was unique and readily identifiable. Because the challenged evidence in this case is not fungible, unlike the cocaine in *Melendez–Diaz* or the blood sample in *Bullcoming*, here strict chains of custody are not required for admission into evidence. *State v. Freiburger*, 366 S.C. 125, 134, 620 S.E.2d 737, 741–42 (2005) ("While the chain of custody requirement is strict where fungible evidence is involved, where the issue is the admissibility of non-fungible evidence—that is, evidence that is unique and identifiable—the establishment of a strict chain of custody

is not required: If the offered item possesses characteristics which are fairly unique and readily identifiable, and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit merely on the basis of testimony that the item is the one in question and is in a substantially unchanged condition."). Rather, readily identifiable items must merely be authenticated by a showing of "evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901, SCRE (listing as acceptable methods of authentication the testimony of a witness with knowledge "that a matter is what it is claimed to be" and distinctive characteristics, such as "[a]ppearance, contents substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances"). "The ultimate goal of chain of custody requirements is simply to ensure that the item is what it is purported to be." *State v. Hatcher*, 392 S.C. 86, 95, 708 S.E.2d 750, 755 (2011).

Here, the challenged evidence was admissible upon a proper showing of identification. Before the items were admitted into evidence, Investigators Day and Crump identified each item as the item they collected, and testified that the evidence was carefully marked and preserved so that it could be identified with absolute certainty. Additionally, as to the t-shirt in particular, both Brakefield and Clack testified that Brockmeyer was wearing the t-shirt at the time of the shooting. Moreover, two photographs depicting Brockmeyer wearing the t-shirt on the night of the shooting (State's Exhibits # 3 and # 4) were already admitted into evidence. Accordingly, the trial court's evidentiary rulings are readily sustainable, for there is ample evidence establishing that these items were, in fact, what they were purported to be. *See Hatcher*, 392 S.C. at 95, 708 S.E.2d at 755 (holding that although "every person handling the evidence need not be identified in all cases," the proponent of the evidence must nonetheless demonstrate "how the item was obtained and how it was handled to ensure that it is, in fact, what it is purported to be"); *see also United States v. Summers*, 666 F.3d 192, 201 (4th Cir. 2011) (In determining whether real evidence is admissible, the trial judge need "only to satisfy itself that it was 'improbable that the original item had been exchanged with another or otherwise tampered with.'" (quoting *United States v. Jones*,

356 F.3d 529, 535 (4th Cir.2004), and citing Fed.R.Evid. 901(a))).

We finally note the obvious—Brockmeyer admitted possessing the .380 pistol at the time it was fired and then throwing the gun and the magazine into the woods afterwards. Brockmeyer's self-authentication of the challenged items renders meritless his chain of custody and *Crawford* arguments. Having authenticated most of the items through his own testimony, Brockmeyer himself negates any possible prejudice by the admission of these items. *See State v. Commander,* 396 S.C. 254, 263, 721 S.E.2d 413, 418 (2011) ("To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, i.e., that there is a reasonable probability the jury's verdict was influenced by the challenged evidence or the lack thereof."); *State v. Mizzell,* 349 S.C. 326, 333, 563 S.E.2d 315, 318 (2002) (" 'A violation of the defendant's Sixth Amendment right to confront the witness is not *per se* reversible error' if the 'error was harmless beyond a reasonable doubt.' " (quoting *State v. Graham,* 314 S.C. 383, 385, 444 S.E.2d 525, 527 (1994))). Accordingly, we find the trial judge's admission of the challenged items of evidence did not constitute reversible error.

## IV.

Brockmeyer argues the trial court committed reversible error in admitting two photographs during his trial—specifically, a photograph of Brockmeyer and a photograph taken from the victim's cell phone. We disagree.

 " 'A trial judge has considerable latitude in ruling on the admissibility of evidence and his rulings will not be disturbed absent a showing of probable prejudice.' " *State v. Brazell,* 325 S.C. 65, 78, 480 S.E.2d 64, 72 (1997) (quoting *State v. Kelley,* 319 S.C. 173, 177, 460 S.E.2d 368, 370 (1997)). "The determination of relevancy and materiality of a photograph is left to the sound discretion of the trial judge." *Id.* "Photographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or not necessary to substantiate material facts or conditions." *Id.*

First, Brockmeyer argues the trial court erred in admitting a photograph of him taken shortly after the shooting because

it suggests a decision on an improper basis in violation of Rule 403, SCRE. During the testimony of Leslie Lawson, the owner of Jager's Bar, the State introduced a photograph of Brockmeyer wearing no shirt. Brockmeyer objected on the grounds that the picture was irrelevant. The State contended the photograph was relevant to show Brockmeyer's agitated demeanor after the shooting, as contrasted with Brockmeyer's desire to portray himself as distraught and crying. The trial court overruled Brockmeyer's objection and admitted the photograph.

As an initial matter, it is our view this matter is not preserved for appellate review because the basis of the objection at trial was relevance, but Brockmeyer argues on appeal that the probative value was substantially outweighed by the prejudicial effect under Rule 403. Because a party may not argue one ground at trial and another on appeal, this issue is not preserved for appellate review.

Nevertheless, on the merits, we find no abuse of discretion in the admission of the photograph. The photograph depicted Brockmeyer close to the time of the shooting and was relevant to his demeanor at the time. Moreover, because other witnesses testified regarding Brockmeyer's demeanor being agitated following the shooting, Brockmeyer cannot prove he was prejudiced by the admission of this photograph. *See State v. Griffin,* 339 S.C. 74, 77–78, 528 S.E.2d 668, 670 (2000) ("There is no reversible error in the admission of evidence that is cumulative to other evidence properly admitted.") (citing *State v. Williams,* 321 S.C. 455, 469 S.E.2d 49 (1996)). In this regard, it was Brockmeyer who sought to bolster his accident defense with evidence of his distraught and weeping demeanor. Surely the State is entitled to counter that evidence.

Lastly, Brockmeyer claims the trial court erred in admitting State's Exhibit # 56, which is a photograph recovered from the victim's cell phone depicting the murder weapon and the victim's pellet gun side by side with the caption, "Wills gun on left my gun on righ[t]." Brockmeyer claims this photograph was offered for the truth of the matter asserted in the caption and, therefore, was inadmissible hearsay. We agree with Brockmeyer but do not find the error reversible.

■ The error was harmless because Brockmeyer admitted owning and possessing the .380 pistol at Jager's on the night of the shooting. Several witnesses saw Brockmeyer with the pistol and the victim with the pellet gun at Jager's on the night of the shooting, and the pellet gun was found tucked in the back of the victim's body immediately after the shooting. Additionally, Deserae Camacho, Brockmeyer's former girlfriend, testified Brockmeyer owned and frequently carried a .380 pistol and that the victim carried a "fake plastic BB gun" for protection. Thus, the caption on the photograph was cumulative to other evidence admitted at trial indicating the ownership of the guns. Because the improper admission of hearsay constitutes reversible error only when it results in prejudice, it is our view Brockmeyer has failed to show he was prejudiced, and thus, has failed to show reversible error. *See State v. Jennings*, 394 S.C. 473, 478, 716 S.E.2d 91, 93–94 (2011) ("Improperly admitted hearsay which is merely cumulative to other evidence may be viewed as harmless.").

## V.

For the foregoing reasons, Brockmeyer's convictions and sentences are affirmed.

**AFFIRMED.**

TOAL, C.J., PLEICONES, BEATTY and HEARN, JJ., concur.