**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Angela D. Brewer, Appellant.

Appellate Case No. 2017-002563

---

Appeal From Pickens County
Perry H. Gravely, Circuit Court Judge

---

Unpublished Opinion No. 2020-UP-255
Submitted June 1, 2020 – Filed August 26, 2020

---

**AFFIRMED**

---

Appellate Defender Susan Barber Hackett, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Senior Assistant Deputy Attorney General William M. Blitch, Jr., both of Columbia; and William Walter Wilkins, III, of Greenville, all for Respondent.

---

**PER CURIAM:** Angela Brewer appeals her conviction for homicide by child abuse for which she was sentenced to twenty years' imprisonment. Brewer argues the circuit court erred (1) in admitting her statement to law enforcement because she

was too intoxicated to give the statement and to knowingly and voluntarily waive her Miranda rights; (2) in allowing a pathologist to testify to the results of a toxicology blood test he did not conduct; and (3) in denying her request for a continuance.  We affirm.

## FACTS

The State alleged Brewer caused the death of her 13-month-old grandson (Victim) by giving him lemonade laced with OxyContin to help him sleep.  Brewer and her husband shared a residence with Brewer's daughter (Daughter), Daughter's fiancé (Son-in-law), and Daughter and Son-in-law's four children—including Victim.  Son-in-law was the adoptive father of Victim.

On the day of Victim's death, October 17, 2014, Husband left for work around 5:00 a.m.  He was scheduled to work the entire business day.  Daughter and Son-in-law took two of their four children to school, but the school would not allow one of the children to stay due to the child's recent fever.  Daughter and Son-in-law then returned to the residence intending to drop the child off, but the child wanted to go with them.  Son-in-law and the child accompanied Daughter to her place of work at approximately 10:30 a.m. and then to Georgia around 12:00 p.m.  At that point, Brewer was alone at her residence with Victim and the youngest child.  Brewer told authorities that: while home with Victim and the youngest child, she fed Victim and gave him lemonade around 11:00 a.m.; Victim played in the living room area and drank more lemonade until he fell asleep while she held him around 1:15 p.m.; and she laid him down in a Pack 'n Play before feeding the other child and watching television.  Brewer alleged that sometime between 2:45 and 3:00 p.m., Victim woke up and smiled at her before falling back asleep.

Sometime after 4:00 p.m., Husband got off work and telephoned Brewer while driving home.  During their discussion, Brewer informed Husband that Victim was still asleep, at which point Husband responded that she should wake him up so that Victim would be able to sleep that night.  Brewer then tried to wake Victim up, but he was unresponsive.  Husband then rushed home, arriving to the house at approximately 4:30 p.m.  When Husband arrived home, Brewer handed him Victim and Husband began performing CPR on him.  Brewer then telephoned 911 for assistance and Victim was taken to the hospital via ambulance.  Brewer also telephoned Daughter and Daughter rushed from Georgia to the hospital.

Tragically, emergency personnel were unable to resuscitate Victim and he was subsequently pronounced dead.  Authorities from the Pickens County Sheriff's

Office, Pickens County Coroner's Office, the South Carolina Department of Social Services (SCDSS), and the State Law Enforcement Division (SLED) all responded to the hospital.  Brewer cooperated with authorities at the hospital and advised that Victim had been "sickly" and "fussy" all day.  However, due to her emotional state, law enforcement officials chose not to take a written statement from Brewer that night.  No one was arrested or *Mirandized*[1] on this date.  Further, Husband gave the Sheriff's Office written permission to search the residence.  Law enforcement took pictures of the residence and retrieved bedding from the crib that Victim had been in, a can of formula, an empty bottle, and two sippy cups that were located either in or beside the Pack 'n Play.  The sippy cups contained two different liquids—one reddish in color, the other yellow-brownish in color.  Victim's autopsy was conducted the next day on October 18, 2014.

Subsequently, law enforcement officials sought a follow-up interview with Brewer to get a better timeline of the events that transpired because the atmosphere at the hospital the night of Victim's death was too emotional.  On November 6, 2014, Brewer agreed to meet with a Pickens County detective for an interview.  The detective questioned whether Victim could have gotten access to Brewer's OxyContin, but Brewer became argumentative and stated that was not possible because she kept her pills with her at all times in a child-proof container and counted them daily.  Brewer was again not given *Miranda* warnings before this interview. After approximately thirty-five minutes of questioning, Brewer provided a written statement[2] to the detective.

On November 17, 2014, the autopsy report was completed and signed by the attending pathologist, Dr. James Fulcher.  The report showed that Victim died from the presence of a high concentration of Oxycodone[3] in his blood.  Dr. Fulcher's report included the results of a toxicology blood test done by the National Medical Services laboratory (NMS) on November 2, 2014.  At some point, items from the residence—including the liquids recovered from the sippy cups—were taken to SLED for chemical testing.  On December 12, 2014, SLED published its chemical report on the liquids.  The yellow-brownish liquid tested positive for methamphetamine[4] and caffeine, and the reddish liquid tested positive for Oxycodone.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] The document on which Brewer wrote the statement contained pre-prepared *Miranda* rights.

[3] Oxycodone is sold under the trade names OxyContin and Percodan.  OxyContin is a long-acting form of Oxycodone.

[4] Victim did not have methamphetamine in his blood.

On December 18, 2014, Lt. Rita Burgess with the Pickens County Sheriff's Office and SLED Agent Christine Cauthen met with Brewer for a subsequent interview. This interview was held at the Sheriff's Office in a formal interview room and was audio and video recorded. Lt. Burgess provided Brewer with a formal *Miranda* rights and waiver form that Brewer signed without incident. During the interview, Brewer stated that Victim did not act sick that day, that she woke up around 3:30 or 4:00 (a.m.) to watch the ID channel, that she usually sleeps during the day because she wakes up so early, and that she made lemonade in a container that morning. She also advised it was the first time that she had made lemonade for Victim. When Lt. Burgess and Agent Cauthen pressed Brewer about the death being an accident—comparing it to a case involving an accidental Benadryl overdose—Brewer hung her head and replied, "That was my baby." Brewer asked for a lawyer about forty-five minutes to an hour into the interview. The interview then ended, Lt. Burgess obtained a warrant, and Brewer was arrested that day. Brewer was eventually indicted for homicide by child abuse on October 11, 2016.

Brewer's trial took place over the course of four days in 2017. On December 11, 2017, a preliminary *Jackson v. Denno*[5] hearing was conducted to determine the admissibility of Brewer's interview statements. Brewer argued her December statement to Lt. Burgess and Agent Cauthen should be excluded. Both law enforcement officials provided testimony regarding the statement and Brewer's physical state. Lt. Burgess testified that she and Agent Cauthen gave Brewer a ride to the Sheriff's Office at approximately 10:00 a.m. because she did not have transportation. Lt. Burgess stated that Brewer advised that she had taken her Oxycodone medication at 6:00 a.m. that morning but appeared coherent at the beginning of their discussion. However, Brewer became incoherent during the interview, at which point the interview was stopped and Lt. Burgess spoke with a judge about obtaining an arrest warrant for Brewer. Agent Cauthen also testified that Brewer appeared coherent and able to comprehend their questions at the beginning of the interview. Agent Cauthen testified that when Brewer appeared to fall asleep, they took a break to get something to drink. When they returned from break, Brewer advised that she had taken a Valium and that she had not informed them of that fact because the Valium did not affect her. Agent Cauthen stated that Brewer admitted she had taken the Valium around the time they arrived to pick her up for the interview.

---

[5] 378 U.S. 368 (1964).

After the circuit court had an opportunity to view the video of the statement, Brewer asserted the video should be excluded in its entirety because she was clearly intoxicated from her prescription medication and was unable to knowingly waive her *Miranda* rights. The State argued that Brewer validly waived her *Miranda* rights but conceded that around the 12:28-minute mark in the video, when the parties went on a break, the influence of the Valium took over and Brewer become visibly different. The State argued this latter portion of the video was nevertheless admissible under Rule 404(b), SCRE, to show intent and lack of accident or mistake. The circuit court ruled that at the beginning of the video, Brewer's responses to questions and general conversation appeared voluntary but acknowledged that later in the video, particularly after the break, "the influence of the Valium seem[ed] to kick in" and Brewer became "almost incoherent." The circuit court redacted any portion of the video taken before Brewer signed the *Miranda* waiver at the 11:49-minute mark, the portions after the parties returned from the break, and a few portions in between that the circuit court also found inadmissible on unrelated grounds.

On December 13, 2017, the third day of trial, the State called upon SLED Agent Timothy Grambow to testify. Agent Grambow worked in the toxicology department at SLED and was qualified as an expert in forensic toxicology. Agent Grambow testified that he personally tested a small can of baby formula and the two small vials of liquid. He explained the methamphetamine could have been found in the yellow-brownish liquid in different ways: (1) it could have been added directly to the liquid, or (2) it could have been smoked or made in a clandestine lab, and the residual from smoke vapors could have gotten inside the container. Agent Grambow stated there was an indication the reddish liquid contained methamphetamine, but he explained SLED's laboratory would not list an item in its official reports unless it was 100% certain the illicit substance was present.

Dr. Fulcher also testified on December 13th. Dr. Fulcher indicated that he was a pathologist and was subsequently qualified as an expert in forensic pathology and toxicology. Dr. Fulcher testified that as part of his examinations, he extracts blood and uses NMS instead of SLED for toxicology screens due to NMS's speed in returning results. He stated:

> It might sound silly in a case like this. It becomes very problematic when it's an adult and there's an insurance policy, and I've got a pending autopsy and that family is about to lose their house because the toxicology lab wants to take six months to do the report. We always use them.

Dr. Fulcher further testified that it was more likely Victim consumed Oxycodone in liquid form as opposed to time-release pill form, OxyContin is "more likely to be able to be dissolved in an acidic environment,"[6] and Victim likely died within one to two hours of having ingested the drug.

Following Dr. Fulcher's testimony, the State rested. Brewer subsequently moved for a continuance, claiming she had not taken her prescription medication since she was taken into custody on December 11, 2017, and had issues sleeping as a result. Brewer argued this would have an effect on her decision whether to testify. The State argued a continuance would be an unnecessary delay, there was no real evidence that Brewer could not effectively communicate with the circuit court or her attorney, and she had in fact been speaking with her counsel throughout the day. The court then engaged in a personal colloquy with Brewer. Based on Brewer's responses, the circuit court found she was able to decide whether she needed to testify and denied the continuance request. After conferring with her counsel, Brewer decided not to testify.

Brewer was found guilty as indicted and sentenced to twenty years' imprisonment. This appeal followed.

## ISSUES ON APPEAL

1. Did the circuit court err by admitting part of the statement Brewer made to law enforcement while she was under the influence of her prescription medication?

2. Did the circuit court err by allowing Dr. Fulcher's testimony regarding the results of the toxicology blood test in violation of Brewer's Sixth Amendment rights?

3. Did the circuit court err by denying Brewer's request for a continuance?

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001). "The admission of evidence is within the discretion of the [circuit] court and will not be reversed absent an abuse

---

[6] The State argued this fact was why Brewer made lemonade with real lemons.

of discretion." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). Furthermore, "[t]he granting of a motion for a continuance is within the sound discretion of the [circuit] court and will not be disturbed absent a clear showing of an abuse of discretion.'" *State v. Geer*, 391 S.C. 179, 189, 705 S.E.2d 441, 447 (Ct. App. 2010) (quoting *State v. Yarborough*, 363 S.C. 260, 266, 609 S.E.2d 592, 595 (Ct. App. 2005)). "An abuse of discretion occurs when the conclusions of the [circuit] court either lack evidentiary support or are controlled by an error of law." *Pagan*, 369 S.C. at 208, 631 S.E.2d at 265.

## LAW/ANALYSIS

### I. Statement to Law Enforcement

Brewer argues that the influence of her prescription medication made her incapable of "voluntarily waiving her constitutional rights and unable to know what she was saying when she spoke to police." Brewer maintains that her slurred speech from the outset of the December statement and her struggle to stay awake during the interrogation are clear evidence of her intoxication. Therefore, she contends, the circuit court erred by admitting the involuntary statement. The State argues that the evidence shows that she was coherent and capable of understanding what she was doing and saying and that the circuit court properly considered the totality of the circumstances when it admitted a portion of the video into evidence. We agree with the State.

The Fifth Amendment provides that no person in a criminal case shall be compelled to be a witness against herself. U.S. Const. amend. V. The prosecution may not use statements stemming from a custodial interrogation of the defendant unless the defendant is first warned about her Fifth Amendment rights. *Miranda*, 384 U.S. at 444. "The test of admissibility of a statement is voluntariness." *State v. Childs*, 299 S.C. 471, 475, 385 S.E.2d 839, 842 (1989). "If a defendant was advised of h[er] *Miranda* rights[] but chose to make a statement anyway, the 'burden is on the State to prove *by a preponderance of the evidence* that h[er] rights were voluntarily waived.'" *Id.* (quoting *State v. Washington*, 296 S.C. 54, 55, 370 S.E.2d 611, 612 (1988)). "A determination whether a confession was 'given voluntarily requires an examination of the totality of the circumstances.'" *State v. Myers*, 359 S.C. 40, 47, 596 S.E.2d 488, 492 (2004) (quoting *State v. Von Dohlen*, 322 S.C. 234, 243, 471 S.E.2d 689, 694–95 (1996), *overruled on other grounds by State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019)). This court has recognized the following factors in a totality of the circumstances analysis:

background; experience; conduct of the accused; age; maturity; physical condition and mental health; length of custody or detention; police misrepresentations; isolation of a minor from his or her parent; the lack of any advice to the accused of his constitutional rights; threats of violence; direct or indirect promises, however slight; lack of education or low intelligence; repeated and prolonged nature of the questioning; exertion of improper influence; and the use of physical punishment, such as the deprivation of food or sleep.

*State v. Moses*, 390 S.C. 502, 513–14, 702 S.E.2d 395, 401 (Ct. App. 2010).

Here, the circuit court properly considered the totality of the circumstances surrounding Brewer's waiver and did not abuse its discretion by admitting part of the December statement. *See Myers*, 359 S.C. at 47, 596 S.E.2d at 492 ("On appeal, the [circuit court]'s ruling as to the voluntariness of the confession will not be disturbed unless so erroneous as to constitute an abuse of discretion."). The record reveals the circuit court viewed the video of the December statement and found Brewer's responses evinced voluntariness. Additionally, Lt. Burgess and Agent Cauthen both testified that Brewer appeared coherent and able to comprehend their questions during the interview. Furthermore, Brewer makes no argument that her background, experience, age, etc., contributed to the involuntariness of the December statement. *See Moses*, 390 S.C. at 513–14, 702 S.E.2d at 401.

Brewer hinges her argument entirely on the fact that she was under the influence of her prescription medication; however, our state's legal precedent makes clear that the mere fact a defendant was under the influence is inadequate to prove her statement was involuntary. *See State v. Saxon*, 261 S.C. 523, 529, 201 S.E.2d 114, 117 (1973) ("[P]roof that an accused was intoxicated at the time [s]he made a confession does not render the statement inadmissible as a matter of law, unless the accused's intoxication was such that [s]he did not realize what [s]he was saying."); *see also State v. Collins*, 266 S.C. 566, 572–73, 225 S.E.2d 189, 193 (1976) ("Proof of [an] accused's intoxication, short of rendering h[er] unconscious of what [s]he is saying, does not require, in every case, that statements [s]he made while in that condition be excluded from evidence."). As noted by the State, there is evidence in the record that the circuit court considered the effect Brewer's prescription drugs had on her statement. This is evident by the court's exclusion of the portion of the video where, by the court's estimation, the Valium "seems to kick in." Furthermore, Lt. Burgess testified that they ended the interview when Brewer became incoherent

during questioning. Thus, evidence supports the circuit court's finding that Brewer was not impaired to the point that she did not realize what she was saying during the earlier portion of her statement. *See Collins*, 266 S.C. at 573, 225 S.E.2d at 193 ("The evidence, including the condition of the defendant[,] presented a factual situation which the [circuit court] determined unfavorably to the defendant. We cannot say that [it] erred.").

Accordingly, we find the circuit court did not abuse its discretion by admitting a portion of Brewer's December statement. *See State v. Sledge*, 428 S.C. 40, 58–59, 832 S.E.2d 633, 643 (Ct. App. 2019) (affirming the circuit court's admittance of the defendant's voluntary statements because the court "thoughtfully considered the fact that [the defendant] was *Mirandized* twice; his rights were clearly and carefully explained; [the defendant] paid close attention to the rights explained to him and acknowledged his waiver of rights in writing; []the atmosphere in the interview room was not hostile and there was no evidence of coercion or pressure to the extent his will was overborne[;]" and the evidence of the defendant's intoxication did not take away his ability to understand and process information or make rational decisions).

## II. Pathologist Testimony

Brewer argues the circuit court erred by allowing Dr. Fulcher to present testimony regarding lab test results from NMS because Dr. Fulcher did not personally conduct or witness the lab testing. Brewer maintains this violated her rights pursuant to the Sixth Amendment's Confrontation Clause. The State argues the lab test results were not testimonial because NMS did "not have any objectively reasonable belief the results of the toxicology would be used in a criminal case." Thus, the primary purpose of the lab results was to assist Dr. Fulcher in determining the cause of Victim's death and did not invoke the Confrontation Clause.

The Sixth Amendment provides that in all criminal prosecutions, the accused has the right to confront witnesses against her. U.S. Const. amend. VI. This right to confront witnesses includes out-of-court testimony or statements introduced at trial that were made for the purpose of establishing or proving some fact. *See Crawford v. Washington*, 541 U.S. 36, 50–51 (2004). However, while "testimonial" hearsay is subject to Confrontation Clause scrutiny, nontestimonial hearsay is not. *Id.* at 68. "To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" *Bullcoming v. New Mexico*, 564 U.S. 647, 659 n.6 (2011) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)). "However, '[w]here no such primary purpose exists, the admissibility of a statement is the concern of state and

federal rules of evidence, not the Confrontation Clause." *State v. Brockmeyer*, 406 S.C. 324, 342, 751 S.E.2d 645, 654 (2013) (quoting *Michigan v. Bryant*, 562 U.S 344, 359 (2011)).

> In determining the primary purpose of the out-of-court statement, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred."

*Id.* at 342–43, 751 S.E.2d at 655 (quoting *Bryant*, 562 U.S. at 360).

Brewer makes no specific argument as to why the lab results were testimonial in nature, merely arguing, "[t]he primary purpose of the lab report from NMS Labs was to establish past events that were potentially relevant to later criminal prosecution" and "the lab report was made under circumstances that would lead an objective witness reasonably to believe that the report, and the statements contained therein, would be available for use at a later trial." The State counters that: "NMS would not have had any objectively reasonable belief that the results of the toxicology would be used in a criminal case. The lab was merely providing a toxicology as part of a routine autopsy as requested many times by Dr. Fulcher—as many as 650 times a year." We agree with the State.

The evidence shows that at the time Dr. Fulcher commissioned the toxicology screen, the authorities involved in the case did not suspect that Victim died from a drug overdose or that a crime had been committed. There had been no arrest made, nor was there clear evidence of criminal activity. *Compare Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009) (finding affidavits reporting the results of a forensic analysis that showed that the *material seized* by the police and connected to the defendant was *cocaine* were easily testimonial) *with Williams v. Illinois*, 567 U.S. 50, 79 (2012) (plurality opinion) (finding an independent lab report's DNA analysis of a vaginal swab in a rape case was not testimonial). Additionally, Dr. Fulcher testified that he routinely extracts blood as part of an autopsy. Therefore, we do not believe the NMS lab results had the primary purpose of assisting in an eventual criminal investigation, and hence, the lab results were not testimonial. *See Brockmeyer*, 406 S.C. at 342, 751 S.E.2d at 654 ("Under the primary purpose analysis required by the Confrontation Clause, where the primary purpose of an out-of-court statement is to serve as evidence or 'an-out-of-court substitute for trial

testimony,' the statement is considered testimonial." (quoting *Bullcoming*, 564 U.S. at 670 (Sotomayor, J., concurring))). Accordingly, the circuit court did not err in allowing Dr. Fulcher to testify to the lab results.

## III.  Motion for Continuance

Brewer argues the circuit court's denial of her motion for a continuance violated her due process rights. Brewer maintains that her mental capacity, due to a two-day lapse in taking her prescription medication, affected her decision regarding whether to testify in her own defense. She argues, therefore, she showed good cause to adjourn proceedings and reconvene the next morning. The State counters that the circuit court did not abuse its broad discretion in denying her motion because the circuit court engaged in a colloquy with Brewer and determined that based on her questions and responses she was fit to decide whether she wanted to testify. We agree with the State.

Continuances may be granted by a presiding judge only upon a showing of good and sufficient legal cause. Rule 7(a), SCRCrimP. "The granting of a motion for a continuance is within the sound discretion of the [circuit] court and will not be disturbed absent a clear showing of an abuse of discretion." *Geer*, 391 S.C. at 189, 705 S.E.2d at 447 (quoting *Yarborough*, 363 S.C. at 266, 609 S.E.2d at 595). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

The record shows that the circuit court conducted an inquiry into Brewer's capacity to effectively decide whether she wanted to testify in her case. After engaging Brewer in a lengthy colloquy, the circuit court did not find good cause for the continuance. *See* Rule 7(a) ("Continuances *may* be granted by a presiding judge . . . only upon a showing of good and sufficient legal cause . . . ." (emphasis added)). Brewer was able to answer all of the circuit court's questions during the colloquy. Therefore, the circuit court's decision was not so arbitrary as to violate Brewer's due process rights. *See Ungar*, 376 U.S. at 589. We find the record contains no evidence warranting reversal of the circuit court's decision to deny the continuance. *See State v. McMillian*, 349 S.C. 17, 21, 561 S.E.2d 602, 604 (2002) ("Reversals of refusal of a continuance are about as rare as the proverbial hens' teeth.").

**CONCLUSION**

Based on the foregoing, Brewer's conviction is

**AFFIRMED.**[7]

**LOCKEMY, C.J., and GEATHERS and HEWITT, JJ., concur.**

---

[7] We decide this case without oral argument pursuant to Rule 215, SCACR.