# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Angela D. Brewer, Petitioner.

Appellate Case No. 2020-001345

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Pickens County
Perry H. Gravely, Circuit Court Judge

---

Opinion No. 28120
Heard February 2, 2022 – Filed October 12, 2022

---

## AFFIRMED IN PART AND REVERSED IN PART

---

Appellate Defender Susan Barber Hackett, of Columbia,
for Petitioner.

Attorney General Alan McCrory Wilson, Senior Assistant
Deputy Attorney General William M. Blitch, Jr., both of
Columbia, and Solicitor William Walter Wilkins, III, of
Greenville, all for Respondent.

---

**JUSTICE HEARN:** Angela Brewer was convicted of homicide by child abuse after her thirteen-month-old grandson died from drinking lemonade mixed with oxycodone. Brewer contends the court of appeals erred in upholding the trial court's

admission of an interrogation video when she was under the influence of medication. This case also requires us to determine the scope of the Sixth Amendment's Confrontation Clause when the State seeks to introduce the contents of a toxicology report from an out-of-state laboratory through a pathologist who did not perform the actual testing. The trial court concluded the toxicology report was not testimonial in nature, thereby removing it from the confines of the Sixth Amendment, and the court of appeals affirmed. While we find no error in admitting the interrogation video, we reverse Brewer's conviction and sentence based on a violation of the Confrontation Clause.

## FACTS/PROCEDURAL POSTURE

On October 17, 2014, at approximately 5:30 p.m., paramedics arrived at Brewer's home after receiving a 911 call about an infant who was not breathing. The child had no pulse, presented a blueish-gray color, and was cool to the touch. Paramedics transported the child to a hospital, where he was pronounced dead.

The child, three of his siblings, his mother, and his mother's fiancé all lived with Brewer and her husband. On the day of the child's death, Brewer's husband left for work around 5:00 a.m., and the child's mother and fiancé dropped off one child at school before returning back to Brewer's house. Later that morning, the mother, fiancé, and another child left for mother's work followed by a trip to Georgia to pick up used furniture for a home the mother was furnishing. Thus, from around 10:30 a.m. to 4:30 p.m., Brewer was the only adult in her house as she cared for the child and his one-month-old sister. According to Brewer, she gave the child lemonade around 1:15 p.m. and then placed him in his Pack 'n Play. She claimed the child woke up and smiled at her around 3:00 p.m. Brewer watched television until she received a call around 4:10 p.m. from her husband as he left work. During this conversation, Brewer informed her husband that the child was sleeping, and he suggested waking him up so that he would sleep better at night. Brewer attempted to awaken the child, but he was unresponsive. Once Brewer's husband arrived home, he began CPR, and Brewer called 911.

Paramedics transported the child to the hospital, and law enforcement arrived there a short time later. Officers did not take any written statements at that time due to the traumatic events, but Brewer was overheard saying that the child had been "fussy and fretful" all day. An officer asked Brewer's husband whether law enforcement could search the residence, and he agreed. During the search, officers documented a daily pill container on the counter and collected two sippy cups, one containing a reddish-colored liquid and the other a yellow-brownish-colored liquid.

Dr. James Fulcher, a pathologist, performed the autopsy. He submitted tissue and blood samples to the National Medical Services (NMS) laboratory—a private laboratory in Pennsylvania—for further testing because at that point, he could not determine a cause of death.

Brewer voluntarily met with a Pickens County detective in his office on November 6, 2014. She rejected the detective's suggestion that it may have been possible that the child could have taken her prescription OxyContin. According to the detective, Brewer became argumentative and combative during that line of questioning, as she informed the detective that it was not possible for the child to accidently ingest her OxyContin because she kept that medicine in her purse at all times.

On November 17, 2014, Fulcher completed his report after receiving the toxicology results (NMS report) and concluded the cause of death was "acute oxycodone toxicity." While Fulcher sent the child's samples to the private lab, investigators used SLED to test the items recovered from the house, including the two sippy cups. The yellow-brownish liquid tested positive for methamphetamine and caffeine, and the reddish liquid tested positive for oxycodone. No report indicated that the child ever tested positive for methamphetamine.

Following the results from NMS and SLED, Rita Burgess of the Pickens County Sheriff's Office and Christine Cauthen of SLED interviewed Brewer. This interview began around 11:40 a.m. on December 18, 2014, in a formal interview room where Brewer was read her *Miranda* rights and signed a form stating she understood and waived them. Burgess and Cauthen asked Brewer whether she was under the influence of any medication, and Brewer informed them she took her prescription OxyContin at around 6:00 a.m. that morning. Later in the interview Brewer mentioned she took Valium shortly before arriving at the sheriff's office, sometime between 10:00 and 11:00 a.m. Approximately forty-five minutes into the interview, Burgess and Cauthen walked outside with Brewer to give her a break because Brewer was slurring her words and struggling to stay awake. The three returned and continued the interview until Brewer requested a lawyer. At that point, the investigators ended the interview, sought an arrest warrant, and charged Brewer with homicide by child abuse.

During a pretrial *Jackson v. Denno* hearing, defense counsel sought to exclude the December 2014 interrogation video, arguing Brewer was too intoxicated to waive her constitutional rights. Burgess and Cauthen testified that Brewer appeared coherent and capable of understanding the agent's questions at the beginning of the interview, but her demeanor worsened as the interview continued. The trial court

viewed the video and acknowledged that Brewer slurred her words from the outset, but determined she was still capable of giving a voluntary statement—at least initially. However, the court determined the second portion of the video was inadmissible because Brewer's condition deteriorated to the point where she was too intoxicated to understand what she was saying.

Turning to the NMS lab report that served as the basis for Fulcher's testimony about the cause of death, defense counsel argued Fulcher could not testify as to the amount of oxycodone in the child because the only support for that conclusion was the lab report. Because the State did not plan to call anyone who actually performed the tests as part of the NMS report, defense counsel argued this violated Brewer's Sixth Amendment right to confront her witnesses. The trial court concluded since the NMS report was not testimonial in nature, the Confrontation Clause was not implicated. Further, the court noted that defense counsel could cross-examine Fulcher.

Fulcher testified the child died from a high concentration of oxycodone, and that the specific amount found in the child could have killed anyone, even an adult. He recounted that he routinely uses the NMS lab for toxicology reports, upwards of 650 autopsies per year. Fulcher testified that this lab offers the best product he can purchase, and he would not sign his official report if he had any indication that the lab did not provide reliable testing. Fulcher also opined that the oxycodone was dissolved into a liquid substance because Brewer's medication was in a pill form designed to provide longer lasting relief. Brewer's neurologist, David Rogers, contrasted Brewer's medication with other oxycodone products intended to provide immediate, short term relief—three to four hours as opposed to twelve hours. Fulcher noted this difference as well and testified that a person can abuse the longer lasting medication by cutting the pill and dissolving it into an acidic substance, thereby increasing the amount of oxycodone because it would remove the ability of the pill capsule to provide a steady rate of medication. This testimony was crucial for the State, as it served to disprove the defense's theory of accidental ingestion.

Ultimately, the jury found Brewer guilty, and the trial court sentenced her to twenty years imprisonment, the mandatory minimum for homicide by child abuse. The court of appeals affirmed, and we granted certiorari.

## ISSUES

I. Did the court of appeals err in affirming the circuit court's admission of Brewer's statement to law enforcement on the ground that the totality of the circumstances evinced voluntariness despite evidence she was intoxicated?

II. Did the court of appeals err in affirming the circuit court's admission of the NMS report on the ground that the test results were nontestimonial, and thus did not implicate the Confrontation Clause?

## STANDARD OF REVIEW

Generally, "[o]n appeal, the conclusion of the trial judge on issues of fact as to the voluntariness of a confession will not be disturbed unless so manifestly erroneous as to show an abuse of discretion." *State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244, 247 (1990); *see also State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001). "This Court does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial judge's ruling is supported by any evidence." *State v. Wilson*, 345 S.C. 1, 6, 545 S.E.2d 827, 829 (2001).[1] Additionally, whether a statement is testimonial and therefore subject to the confrontation clause is a question of law reviewed de novo. *See United States v. Mathis*, 932 F.3d 242, 255 (4th Cir. 2019) (noting an alleged confrontation clause issue presents a question of law).

---

[1] Throughout this appeal, the parties have analyzed the standard of review under the abuse of discretion standard, and the court of appeals did too based on our jurisprudence. While we are not bound by the parties' position on the standard of review, we do note that some jurisdictions view the question of whether a statement was voluntarily given as a mixed question of fact and law. *See, e.g.*, *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) ("We accept the district court's factual findings unless they are clearly erroneous. We review the ultimate determination that the accused knowingly and voluntarily waived these rights de novo."); *Schwartz v. Wyoming*, 483 P.3d 861, 864 (Wyo. 2021) ("When we review the denial of a motion to suppress, we adopt the district court's factual findings unless they are clearly erroneous . . . Because the district court had the opportunity to 'assess the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions,' we view the evidence in the light most favorable to its decision . . . . We review issues of law de novo . . . Voluntariness is a question of law that we review de novo.") (internal citations omitted). While these jurisdictions employ a standard that is nearly identical to the one we discussed recently in *State v. Frasier*, Op. No. 28117 (S.C. Sup. Ct. filed Sept. 28, 2022) (Howard Adv. Sh. No. 35 at 12), we leave for another day whether *Frasier* governs this issue.

# DISCUSSION

## I.     *Admission of the December 2014 Interrogation Video*

Brewer argues the court of appeals erred in affirming the trial court's decision to admit a portion of the December 2014 interrogation. Specifically, Brewer contends the trial court erred in concluding she was capable of waiving her constitutional rights because she was too intoxicated for a valid waiver. Conversely, the State asserts the court of appeals properly determined the trial court did not abuse its discretion in admitting the first portion of the video. The State contends the trial court properly exercised its discretion by excluding the latter part of the interrogation where Brewer's demeanor demonstrated the effects of her prescription medication had progressed to the point where she was too intoxicated to understand what she was saying. We agree with the State.

"A statement obtained as a result of custodial interrogation is inadmissible unless the suspect was advised of and voluntarily waived his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)." *State v. Saltz*, 346 S.C. 114, 135-36, 551 S.E.2d 240, 252 (2001). Even if a defendant was advised of her *Miranda* rights but nevertheless chose to speak, "[t]he burden is on the State to prove *by a preponderance of the evidence* that h[er] rights were voluntarily waived." *State v. Washington*, 296 S.C. 54, 55, 370 S.E.2d 611, 612 (1988) (quoting *State v. Neeley,* 271 S.C. 33, 40, 244 S.E.2d 522, 526 (1978)). Whether a statement was voluntarily given depends on the totality of the circumstances. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). Concerning intoxication, this Court has stated:

> The fact that one is intoxicated at the time a confession is made does not necessarily render him incapable of comprehending the meaning and effect of his words. Therefore, proof that an accused was intoxicated at the time he made a confession does not render the statement inadmissible as a matter of law, unless the accused's intoxication was such that he did not realize what he was saying. Proof of intoxication, short of rendering the accused unconscious of what he is saying, "goes to the weight and credibility to be accorded to the confession, but does not require that the confession be excluded from evidence."

*State v. Saxon*, 261 S.C. 523, 529, 201 S.E.2d 114, 117 (1973) (internal citation omitted). A few years following *Saxon*, the Court again reiterated that "[p]roof of accused's intoxication, short of rendering him unconscious of what he is saying, does not require, in every case, that statements he made while in that condition be

excluded from evidence." *State v. Collins*, 266 S.C. 566, 572–73, 225 S.E.2d 189, 193 (1976).

We disagree that the trial court erred in permitting the State to play the first portion of the video. Initially, while Brewer understandably emphasizes the solicitor's concession that Brewer was "clearly . . . under the influence of some sort of drug, as she tells the officer it's Valium," and that she slurred her speech and struggled to stay awake, there is evidence that Brewer, while affected by her medication at the beginning of the interview, sufficiently understood the nature of the questions and was able to answer them. Although her demeanor deteriorated as time progressed, the trial court noted, "In reviewing the video, I believe -- there's no question, I think, at the first of it there is some little slurring, I think. But I think that -- her responses to the question and her general conversation, I think shows that it is voluntary, that she knows what's going on." The court continued,

> And there's definitely a point where, I guess, you know, the influence of the Valium seems to kick in more based on what she said, if she took it at 10:00 to 11:00. Because she definitely, at some point, becomes almost incoherent and mentions something about a 300-degree fever. I mean, I think there's -- definitely, after the break, it's much worse. I mean, there's a distinct difference.

Further, the trial court wisely rejected the State's argument that the second half of the video should have been shown to the jury under Rule 404(b), SCRE because it demonstrated intent and a lack of mistake as to how Brewer carelessly handled her medication. Additionally, the court also excluded several comments during the portion that was played to the jury because those references were either irrelevant or violated Rule 403, SCRE. While the trial court's evidentiary decisions under Rules 402, 403, and 404(b) certainly are distinct from determining whether Brewer's statements were voluntary, the court's deft handling of the video's admission is informative.

Overall, the trial court understood the relevance of intoxication and rendered its decision based on our case law that requires a degree of intoxication sufficient to render a person incapable of comprehending what she is doing—which is exactly what *Saxon* and *Collins* set forth. While Brewer asserts the court of appeals misapplied *Saxon*, she alternatively argues this Court should overrule that decision. We decline to do so because *Saxon* does *not* stand for the proposition that intoxication just short of unconsciousness may *never* render a statement involuntarily made. Instead, *Saxon* is premised on the fact that intoxication does not "necessarily" render a statement involuntary nor does intoxication alone mean that a

person is not capable of understanding what she is saying or doing. Our approach in ascertaining whether an individual's intoxication renders a statement involuntary is consistent with that taken in numerous jurisdictions. *See, e.g.*, *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) ("Sleeplessness, alcohol use and drug use are relevant to our analysis, but [i]ntoxication and fatigue do not automatically render a confession involuntary. Instead, the test is whether these mental impairments caused the defendant's will to be overborne.") (internal citation omitted); *Schwartz v. Wyoming*, 483 P.3d 861, 866 (Wyo. 2021) ("However, intoxication, without more, does not render a statement involuntary. When an appellant alleges his statement was involuntary due to intoxication, we look to whether the appellant was so intoxicated . . . he was unable to appreciate the nature and consequences of his statements." (internal citations omitted)); *Norton v. State*, 745 S.E.2d 630 (Ga. 2013) (concluding although defendant admitted he had taken 15-20 pills of Xanax and had been drinking bourbon, he appeared to understand what was occurring, understood his *Miranda* rights, and spoke freely with officers); *State v. Phillips*, 711 S.E.2d 122, 133 (N.C. 2011) ("While intoxication is a circumstance critical to the issue of voluntariness, intoxication at the time of a confession does not necessarily render it involuntary. It is simply a factor to be considered in determining voluntariness . . . An inculpatory statement is admissible unless the defendant is so intoxicated that he is unconscious of the meaning of his words." (internal citations omitted)). Accordingly, we affirm the trial court's decision to admit the first portion of the video.

## II.     *Confrontation Clause and the NMS lab report*

Brewer contends the court of appeals erred in affirming the trial court's determination that the NMS lab report was nontestimonial, meaning the Confrontation Clause was not implicated. She asserts the primary purpose of the report was to establish evidence likely to be used in a criminal trial, and that the trial court's ruling effectively permitted Fulcher, the pathologist, to testify as to the State's key piece of evidence without having any personal knowledge how the test was performed. Further, because Fulcher essentially vouched for the credibility and reputation of the NMS lab, Brewer argues this heightened the need to cross-examine the individual who actually conducted the test.

Conversely, the State asserts the lab report is not testimonial because objectively, the purpose of the report was to assist Fulcher in determining the child's cause of death, not to prepare a document in lieu of actual testimony at trial. The State argues the fact that law enforcement did not immediately suspect Brewer of any criminal wrongdoing supports its position that the lab report could not have been

created for the primary purpose of establishing evidence for a future trial. Regardless, the State contends that even if the trial court erred, it was harmless.

"The Sixth Amendment to the United States Constitution guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.'" *State v. Brockmeyer*, 406 S.C. 324, 340, 751 S.E.2d 645, 653 (2013) (quoting U.S. Const. amend. VI). Whether the Confrontation Clause applies "turns on whether the challenged out-of-court statement is testimonial . . . [and] 'applies to "witnesses" against the accused—in other words, those who 'bear testimony.'"" *Id.* at 342, 751 S.E.2d at 654 (quoting *Crawford v. Washington*, 541 U.S. 36, 51 (2004)). In determining whether an out-of-court statement is testimonial, courts employ the primary purpose test, which consists of "where the primary purpose of an out-of-court statement is to serve as evidence or 'an out-of-court substitute for trial testimony,' the statement is considered testimonial." *Id.* (quoting *Bullcoming v. New Mexico*, 564 U.S. 647, 671–72 (2011) (Sotomayor, J., concurring)). If the primary purpose is not to serve as evidence at a later trial or as a substitute for in person testimony, the Confrontation Clause does not apply and admissibility is left to the rules of evidence. *Id.* at 342, 751 S.E.2d at 654–55. To make that determination, courts review "not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.'" *Id.* at 342–43, 751 S.E.2d at 655 (internal citation omitted).

Before reaching the question of whether the NMS report was testimonial, it is helpful to discuss the evolution of the Confrontation Clause beginning with the seminal case of *Crawford v. Washington*, 541 U.S. 36 (2004). There, the United States Supreme Court held that testimonial out-of-court statements are not admissible under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Id.* at 50-51. The Supreme Court examined the history of the Confrontation Clause dating back to the 17th century and the Court of the King's Bench in England. *Id.* at 45 (citing *King v. Paine,* 5 Mod. 163, 87 Eng. Rep. 584 (1696)). *Crawford* rejected the notion that the rules of evidence, which typically permit an expert to depend on an out-of-court statement if the expert relied on that assertion in forming his opinion, solely governs this arena. *Id.* at 51 ("Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices.").

While *Crawford* concerned statements made by an individual to police, the Supreme Court has addressed its rationale in the context of forensic testing. In

*Melendez-Diaz*, the Supreme Court concluded the Confrontation Clause prevented the state from relying on affidavits from forensic analysts in lieu of testimony attesting that the substance seized by law enforcement was cocaine. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009). The majority explained that the form and substance of the evidence—affidavits "functionally identical to live, in-court testimony"—militated towards finding that they were testimonial in nature. *Id.* Significantly, the Supreme Court also noted, "The fact in question is that the substance found in the possession of Melendez–Diaz and his codefendants was, as the prosecution claimed, cocaine—the precise testimony the analysts would be expected to provide if called at trial." *Id.* The Supreme Court rejected the argument that forensic testing is inherently reliable so as to overcome the purpose of cross-examination. *See id.* at 318 ("Respondent and the dissent may be right that there are other ways—and in some cases better ways—to challenge or verify the results of a forensic test. But the Constitution guarantees one way: confrontation. We do not have license to suspend the Confrontation Clause when a preferable trial strategy is available.").

Following *Melendez-Diaz*, the Supreme Court concluded a lab report indicating a person's blood alcohol concentration was testimonial, and thus, the Confrontation Clause applied. *Bullcoming*, 564 U.S. at 663-64. In reaching its decision, the Supreme Court rejected the state supreme court's reliance on the business record exception to hearsay rules. *Id.* at 670 (Sotomayor, J. concurring). The Supreme Court explained that "*Melendez-Diaz*, relying on *Crawford* 's rationale, refused to create a "forensic evidence" exception to this rule." *Id.* at 658. The Supreme Court concluded that although the New Mexico Supreme Court correctly determined that the lab report was testimonial, the state court erred in holding that another expert—one who did not perform the test but was otherwise familiar with that test—could act as a "surrogate witness" in order to satisfy the Confrontation Clause. *Id.* at 662. Importantly, the majority admonished, "[T]he Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." *Id.*

In a split decision without a clear majority, the Supreme Court concluded an expert could testify about the results from DNA testing conducted by an outside agency. *Williams v. Illinois*, 567 U.S. 50, 56 (2012). In *Williams*, the defendant was convicted of rape following a bench trial where an expert testified that a DNA report from an outside agency matched a profile tested from the defendant's blood through a state agency. *Id.* at 56. The plurality noted that experts may generally express an opinion that is based on facts they assume but do not have personal knowledge of,

provided the party that calls the expert introduces other evidence to support the facts assumed by the expert. The plurality explained the interplay between general rules of evidence and the Confrontation Clause as: "We now conclude that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted." *Id.* at 57-58. Importantly, the plurality noted that the testifying expert did not vouch for the credibility of the lab nor was the evidence offered to prove the truth of the matter asserted. *Id.* at 56-57.

While *Crawford*, *Melendez-Diaz*, and *Bullcoming* presented a rather clear picture of the type of out-of-court evidence that is testimonial, several courts from across the country have noted how *Williams* has muddied the waters. *See, e.g.*, *United States v. Turner*, 709 F.3d 1187, 1189 (7th Cir. 2013) ("[T]he divergent analyses and conclusions of the plurality and dissent sow confusion as to precisely what limitations the Confrontation Clause may impose when an expert witness testifies about the results of testing performed by another analyst, who herself is not called to testify at trial."); *State v. Hutchison*, 482 S.W.3d 893, 907 (Tenn. 2016) ("Any hopes of a single standard on when an out-of-court statement is considered testimonial were dispelled in [*Williams*]."). Indeed, even two members of the Supreme Court have acknowledged the lack of clarity in this area of the law. *See* *Williams*, 567 U.S. at 120 (Kagan, J., dissenting) ("In the pages that follow, I call Justice Alito's opinion 'the plurality,' because that is the conventional term for it. But in all except its disposition, his opinion is a dissent: Five Justices specifically reject every aspect of its reasoning and every paragraph of its explication."); *Stuart v. Alabama*, 139 S. Ct. 36 (Mem.) (2018) (Gorsuch, J., dissenting from the denial of certiorari) (remarking that *Williams* "yielded no majority and its various opinions have sown confusion in courts across the country").

Our Court has also addressed whether certain out-of-court statements are testimonial in nature. In *Brockmeyer*, the Court concluded that statements contained in a computerized chain-of-custody log were not testimonial in nature, and thus not subject to the Confrontation Clause. 406 S.C. at 340, 751 S.E.2d at 653. Specifically, the Court noted,

> [T]he evidence logs do not purport to prove any fact necessary to the conviction, and the custodians who did not testify were in no manner involved in the testing or analysis of the recovered items; thus, the statements by non-testifying custodians contained in the chain-of-custody logs are not testimonial in nature because their "primary purpose" is not to constitute evidence in a criminal trial.

*Id.* at 352, 751 S.E.2d at 660.

With that landscape in mind, we now turn to the NMS report at issue in this case. Our review of the record indicates that while the child's cause of death was not immediately known, law enforcement zeroed in on Brewer as a suspect early on during its investigation, beginning with questioning about her medications at the hospital the day the child died. Police inventoried Brewer's medication bottles and seized the child's sippy cups in her home later that evening. Detectives submitted the sippy cups to SLED for additional testing while the pathologist utilized a private lab for the same purpose. Additionally, law enforcement conducted a follow-up interview with Brewer and questioned her about the possibility the child could have accessed her oxycodone. Thus, although the forensic analyst who actually performed the testing may not have known each particular fact calling Brewer's innocence into question, the State cannot undermine the Confrontation Clause by utilizing a private laboratory in a criminal trial without calling the individual who performed the testing. Moreover, section 17-5-520 specifically requires that an autopsy be done by a "pathologist with forensic training" whenever a child dies as a result of violence, in a suspicious manner, or in an unexplained way. S.C. Code Ann. §§ 17-5-520, 540 (2014). Other state appellate courts have looked to their respective statutes governing autopsies, and many have reasoned that if an autopsy is legally required in order to investigate a death, then its primary purpose is for a criminal investigation and thus, is testimonial. *See State v. Frazier*, 735 S.E.2d 727, 731 (W.Va. 2012) ("The next logical question is whether Dr. Belding's autopsy report was prepared to establish or prove past events potentially relevant to later criminal prosecutions and, therefore, meets the primary purpose test. The answer to this is an unqualified yes."); *Cuesta-Rodriguez v. State*, 241 P.3d 214, 228 (Okla. 2010) (finding that an autopsy report in a suspicious death was testimonial where state law mandated an autopsy be performed and noting that it was "obvious" that a medical examiner would reasonably understand that any statements in that report could be used in a later criminal prosecution); *State v. Locklear*, 363 N.C. 438, 452, 681 S.E.2d 293, 305 (N.C. 2009) (holding the Confrontation Clause barred the state from introducing evidence of forensic analysis from a pathologist and dentist who did not testify); *but see Ackerman v. State*, 51 N.E.3d 171, 189 (Ind. 2016) (concluding that an autopsy report was not testimonial). While we must review the primary purpose of the evidence to ascertain whether it is testimonial, we cannot ignore the reality that if a criminal prosecution takes place, the NMS report would be critical to prove the State's case.

Further, this case is more analogous to *Melendez-Diaz* and *Bullcoming* than either *Williams* or this Court's decision in *Brockmeyer*. Beginning with *Brockmeyer*,

the NMS report here served as the basis for Fulcher's cause of death determination and revealed the quantity of oxycodone found in the child. Both points go straight to the heart of the State's burden of proof for this homicide by child abuse charge because the State had to establish the cause of death and disprove Brewer's contention that the child accidently ingested oxycodone by swallowing a pill or pills.[2] Indeed, the rationale in *Brockmeyer* for finding notes on a computerized chain of custody log as nontestimonial—that the evidence was not necessary to prove a key fact necessary for a conviction or that the custodians did not perform any testing—is exactly the reverse of what is present in this case. In addition, none of the safeguards in *Williams*—that the evidence was not used to prove the truth of the matter asserted, that a judge in a bench trial would understand the purpose for its admission, and that the expert did not vouch for the integrity of the lab—exist in this case. Fulcher testified the NMS lab offered the best product he can purchase, and he would not sign his official report if he had any indication that the lab did not provide reliable testing. In closing, the State informed the jury about the contents of the report and how Fulcher repeatedly testified that the lab was trustworthy and the preeminent lab in the country. Accordingly, the State violated Brewer's Sixth Amendment right to confront the witnesses against her because it was permitted to use a surrogate witness to explain the results of a test involving a key fact at issue and to essentially vouch for the accuracy of that lab without undergoing the "crucible of cross-examination." *Crawford*, 541 U.S. at 61.

We acknowledge that it may be more efficient for a pathologist to utilize a private lab in investigating a death in some situations. However, the Confrontation Clause does not carve out an efficiency exception, and therefore, we cannot compromise a defendant's constitutional rights in the name of efficiency. *See id.* at 67 ("The Constitution prescribes a procedure for determining the reliability of testimony in criminal trials, and we, no less than the state courts, lack authority to replace it with one of our own devising."). Instead, because the NMS lab report is testimonial in nature, Brewer should have had an opportunity to cross examine the

---

[2] It is for this reason that we also reject the State's harmless error argument, as the jury was able to hear about the quantity of oxycodone found in the child, which served to undercut the defense's theory of the case. Without any ability to cross-examine the actual individual who performed the forensic tests, the defense was unable to ascertain whether the testing procedures utilized by the lab were followed, or whether there was some other reason that influenced the results. *See Crawford*, 541 U.S. at 61 ("[The Confrontation Clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.").

individual who performed the testing. Without being afforded that right, Brewer lost her constitutional right to "force[] the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth.'" *California v. Green*, 399 U.S. 149, 158 (1970) (internal citation omitted).

## CONCLUSION

We affirm the court of appeals' conclusion that the trial court did not err in admitting the first portion of the December 2014 interrogation video, but we reverse Brewer's conviction and sentence because the Confrontation Clause mandates that an individual who actually performed the forensic testing be subject to cross-examination.

**AFFIRMED IN PART; REVERSED IN PART.**

**BEATTY, C.J., KITTREDGE, FEW, JJ., and Acting Justice Aphrodite K. Konduros, concur.**